The Fourth District Appellate Court of the State of Illinois has now convened. The Honorable Craig H. D. Armon presiding. Morning, counsel. We'll call case number 4-22-0773. Peggy Maas, appellee v. Board of Education appellant. Could the counsel for the appellant please state your name for the record, please? Yes, your honor. Good morning. My name is Melinda Manline. Good morning, your honor. My name is Melinda Manline. Thank you. Counsel for the appellant, you may proceed. Thank you, your honor. Good morning and may it please the court. My name is Frasier Satterly and I represent the defendant appellant, the Board of Education of Peoria Public School District Number 150. We find ourselves here today because of the utter lack of diligence on the part of plaintiff Peggy Maas and because of the trial court's erroneous findings regarding the undisputed facts of this case. Your honors, this entire controversy is about notice. When did the school district have notice that plaintiff had enrolled in the teacher's retirement insurance program known as TRIP? The undisputed answer is not until October of 2017, seven years following her retirement in 2010, when she contacted the district for the first time inquiring about the payments of premiums. Now, there are two key components to this case. The first is the language of the party's collective bargaining agreement and the second is the form that is provided to retirees by TRS, the teacher retirement system, that must be completed to enroll in TRIP and that also must be returned to the district for completion to notify the district that the retiree has enrolled in TRIP and that the district should be billed directly by TRS for those premiums. Now, this form is referred to as the CMS form throughout the party's pleadings and the briefs before your honors now and I will refer to it that way for the purposes of this argument as well. So, turning now to the CBA, it provides that eligible retirees qualify for the district's retirement insurance program, which was a unique benefit of the contract between the Peoria Federation of Teachers and the Board of Education of Peoria 150. It provides that except as noted, retirees may not participate in the district's plan but may enroll in the teacher's retirement health plan. Now, for those employees enrolled in TRIP, the board will pay towards insurance coverage the lesser of the amount paid on behalf of the active employees or the actual amount of the TRIP individual premium. Now, that language in the is not automatic. It is not voluntary. This means that the language of the contract itself implicitly requires notice. In other words, there must be some way for plaintiff to notify the district that she has exercised this choice and is choosing this option. And your honors, there is a way to notify the district and it's via the CMS form. Now, TRS administers a TRIP program. It's a third-party entity. The district does not administer the program. TRS requires that retirees complete the form if they are enrolling in the teacher's health insurance. Now, section eight of that form, and the form is provided in the appendix, your honors, it's at A170 through 171. Section eight of the form specifically provides for the situation that confronts the court in this case. And it says that if the school district is paying your portion of monthly premium, the school district representative must complete the appropriate information and sign the appropriate line. The school district representative must also identify the district name and TRS code. Now, throughout the course of this case, there has been a lot of quibbling over what the form says or doesn't say, or that the contract itself does not include a timeliness requirement. That neither the form nor the contract contains some kind of time limitation for the form submission. But first, the language of the form is clear with respect to the requirement that a school district representative complete section eight. And when you think about it, it makes sense. TRS wouldn't rely on a retiree's word that the district was footing the bill for these premiums. So TRS requires confirmation from the district that it's to bill the district directly. In this case, and the undisputed facts are that Hamer testified that when the district receives this form from its retirees taking advantage of that program, she fills in the required information on behalf of the district. She faxes a form to TRS. TRS then bills the district directly for the retiree trip premiums as set forth in the CBA. Even TRS has indicated that it's the plaintiff's responsibility to provide this form to the district to complete. That is the undisputed practice and procedure. Second, as to the contract, if a retiree wants their retirement premiums paid immediately following their retirement with no gaps in coverage or no premiums coming out of their own pocket, they submit to the form to the district before they retire. Otherwise, any retiree could sit on their hands for years, come back to the district and say, oh, hey, I actually did mean to exercise my right to this benefit. And I'd like for you to rectoactively please pay my premiums plus statutory damages and fees. Council, let me ask you a question. What if a retiree had better insurance through a spouse or whatever the means were and didn't need this because they weren't paying for health insurance? Sure. And Ms. Hamer testified that that does in fact happen. It is voluntary. There are times that retirees, even though it's a free benefit, that it's a free benefit under the contract that retirees choose not to do it, whether it be because they have maybe they go work somewhere else and have better insurance or they're on a spouse's insurance that provides better coverage. What happens then when that family coverage goes away or when they leave their other job and the insurance has expired or is not eligible for the teacher's retirement benefit? Well, I think there are two components to that. If they don't notify the district that they're enrolling, if they don't turn this form back into the district, then the district, the assumption is they haven't enrolled. Let's say that they go on to their spouse's plan. This retirement benefit is only available until they are Medicare eligible, until they turn 65. So let's say they're 57. They work for a few years somewhere else and they have retirement insurance and then they become Medicare eligible. That's how that coverage would work. If I'm understanding your question. If they weren't Medicare eligible yet, could they come back and say I want this benefit now? Well, I think that's the entire crux of the case. If they haven't notified us that they want it, they cannot come back after the fact and say I'm eligible for it now. Why would you notify if you don't need it? So I suppose the answer would be the district would only be eligible, would only be required to pay the premiums as of the date they were given notice that the retiree wanted it. Okay, so in one sense, the only time limit is the Medicare time limit. Would that be correct? Right. The Medicare, the coverage is no longer available once the retired, the retiree is eligible. Is that because other school districts don't provide it? That's correct. It's bargained for as part of the contract. Peoria, the Board of Education in later contracts has now has actually bargained this out of the contract. But the district at the time was one of only one or two school districts that offered to pay full retiree insurance premiums for their retirees. Okay. So I just want to follow up on one piece here. And this is important because plaintiff herself admitted that practically there must be some method for notifying the defendant of retirees enrollment and trip in order for the retirees premiums to be paid. And this admission is and so too is her admission that she failed to provide this form to the district. In other words, and as I've stated before, the district would have no knowledge that she had enrolled and trip unless they have unless she provided this form. With respect to past practice, I'd like to take a moment to touch a bit more on that. It is not as plaintiff asserts in affirmative defense. Past practice is a readily accepted tool of contract interpretation and implementation. Past practice determines often an implied term of the contract. And here, this is a contract that plaintiff has consistently hammered on as dispositive to her case. The practice supplements the contract. Now, the trial court erroneously found that the district provided no authority for its assertion regarding past practices that would override the terms of the CBA, and that we didn't prove that such practice existed in a relevant time period from 2006 to 2010. That's simply not the case and ignores the relevant testimony of Ms. Hammer and the form itself. According to plaintiff, a practice is only established if there's written evidence, but there is no requirement here that the district have a policy regarding the form, and the form is the written evidence. The form speaks for itself. If you want this, and you want the district to pay for it, give it back to the district to complete with the necessary information, and TRS will build a district. I'm sorry, may I interrupt you for a moment? Please. Is there anything in the CMS enrollment form or in the CBA that could be interpreted as a deadline by which someone such as a plaintiff must submit Section 8? I mean, there is no express timeline within either the form or the CBA with respect to admission, with respect to submission of the form, but there are two things. As I noted previously, if the retiree wants to take advantage of the benefit and doesn't want there to be a gap or have those premiums come out of their retirement annuity, they submit the form to the district prior to retirement. The other issue, which I think is the crux of the case here, is if this court accepts the theory that there is no timeline, so at any point, either following their retirement or after they return Medicare eligible, that a retiree, and like the plaintiff is doing here, come back and say, you know, I didn't fill out this form, and I meant to because I wanted to take advantage of this benefit. Then what's the point of the district to come back and retroactively pay those benefits and fees when it didn't have knowledge that the retiree wanted to take advantage of the benefit? Does that get to your latches argument and the requirement that you establish, specifically what form of prejudice has been suffered? Yes, Your Honor, I believe that is intertwined with our latches argument. I think the lack of diligence here, and I'll just move on to that, is staggering, but on the prejudice prong, the issue is a retiree who could afford to do it could wait, pay the premiums themselves, come back to the district and say, well, the collective bargaining agreement says that you owe me this, and now not only do you owe me these premiums, you owe me almost $100,000 in statutory fees by virtue of the Wage Payment and Collection Act, and that is the prejudice. It also prevents the district from really being able to anticipate their liabilities with respect to this retirement insurance program. It's a public school district funded by taxpayer dollars. They budget for this. Now you would have people coming out of the woodwork potentially saying, well, not only do I get to be paid this, but I want all the other stuff on top of it, all the other fees on top, and that is prejudicial, and that's exactly what... When you say you could have all of these other people, just in terms of historical data, how many others are similarly situated to Ms. Moss in terms of this failure to submit the Section 8 portion of the form? For a failure to submit the form? Correct, yes. We are not aware of any other individual who has failed to submit the form after the amount of time that has passed here. What does that tell us then in terms of the potential prejudice then that we want to affirm such an act would have on the school district? Well, the school district employs approximately 700 to 800 certified staff members who's retiring in what year obviously depends on where they are in the retirement pipeline and how old they are, but as it stands right now, any retiree who after the fact believes that they did not receive this benefit or they wanted the benefit and didn't provide the form could come back to the district requesting these amounts. But if she's the only one that you can point to that hasn't ever submitted the Section 8 portion of the form, would you agree that it doesn't point to a real likelihood that there's going to be a significant prejudicial effect in the future? No, Your Honor, I wouldn't agree to that. I believe that it would practically have an impact of potentially raising these claims for other retirees in the future that maybe found themselves in the same predicament as Ms. Moss, which is they didn't pay attention to the contract, they didn't read the form, and they didn't submit it to the district. On one other item I want to go and facts submitted about the fact that some retirees came forward usually within the first month following retirement and realized that they had not turned in the form and that that amount was being taken out of their annuity and the district made that adjustment. So that I think underscores, Your Honor, again, Ms. Moss's lack of diligence. Those people received their monthly annuity from TRS, they know how much the monthly annuity is to be, and they saw a large chunk of money missing from that premium and immediately contacted the district and that was rectified, and that's not what happened here. This happened seven years after the fact. Thank you. I hope that I've answered your question with respect to that. So, again, quickly, and I'll wrap this up, but the practice was as follows. The district sent an email to all certified retirees regarding their retirement paperwork and the submission of forms. It organized meetings with TRS representatives and emailed a reminder to all teachers. Ms. Hammer and her insurance specialist personally attended these meetings to remind retirees to for its members regarding retirement. The CMS form was provided as part of that retirement packet to retirees and the form requires that the school district representative complete the form if the district is to pay the retirees premiums. The plaintiff conceded she attended this meeting and it's clear that she received the form considering she filled it out and enrolled. Those are all undisputed facts. And what is more, plaintiff did not and cannot dispute here Hammer's testimony that one, the only information regarding enrollment and TRIP the district receives is via the CMS form submitted by the retiring employee to the district and two, it's not uncommon for qualifying employees to utilize other forms of health insurance and not enroll in TRIP. That's the practice. That is what is required to put the district on notice that plaintiff has exercised her choice to enroll and plaintiff did not follow the practice. Now, with respect to the Lachey's argument, your honors, there can be no doubt here as to plaintiff's lack of diligence. She admitted that she received her union contract but never read it. She admitted that she never read Ms. Hammer. She's the director of employee services. She admitted that she never read Ms. Hammer's emails or the contract. She admitted that she hates paperwork and that she did not know the district was required to complete section eight of the form. For seven years, she received TRS statements indicating that premium amounts were being deducted from her retirement annuity but she did not pay attention to them. It's a direct quote. Plaintiff received her annuity amounts monthly that were direct deposited into her bank account but she did not notice this discrepancy in her retirement annuity amount, which I believe is a tacit admission that she had no idea how much her monthly annuity was actually supposed to be. And she's offered no reasonable excuse for the seven-year delay and all but admits a lack of diligence. We've touched on prejudice but I'd like to go back to it. Again, I think that prejudice is inherent here where there exists a detriment or inconvenience to the public based on the plaintiff's delay in bringing the action. And here, because her delay in providing the district with the payment of back premiums but close to $100,000 in statutory fees. And I mentioned before, the additional prejudice is that the district can't anticipate its liabilities based on the plaintiff's theory because anyone could come forward at any time and say that they wanted to take advantage of this benefit. Ms. Satterley, just quickly in regards to versus Board of Education, in that case, didn't the court indicate that there would have to be proof not just that the risk of prejudice was inherent but actual evidence of the prejudice itself? Yes, and the court found that there was no indication from the record that there was such an economic interest. I'm sorry, that there was such a detriment. It found that ultimately, it reversed the finding of summary judgment on this piece and saying that finding that there was no indication from the record that the district had hired a teacher to replace the plaintiff. And without that... I'm sorry, so what is the appeal? The prejudice is penalizing the district for something that it had no knowledge that plaintiff had taken advantage of and seeking not only $18,000 plus in premiums but the statutory damages as well. All right. Thank you, counsel. You'll have an opportunity on rebuttal. Thank you. Counsel for the appellee. May it please the court, my name is Melinda Manline and I am the attorney for appellee plaintiff Peggy Moss. Now, we're here today really to address the defendant's three affirmative defenses, specifically Latch's subject matter jurisdiction and past practices. And though defendant has still yet to acknowledge it, these are all claims that it is its burden to prove 100%. Now, certainly, I think that I'm open to any questions that the court has. I think we thoroughly briefed all of our positions on these, but I'm going to go through and just touch on the biggest ways that the defendant has failed both legally and factually to prove a single one of its defenses. With Latch's, as I'm sure the court has noticed, the biggest theme of the defendant's argument is this seven-year delay. That's what it concentrates on throughout its whole brief and throughout this whole case. But as was mentioned earlier, there is no time limit in the CBA language. There's no time limit in the CMS form as the defendant likes to call it. We call it the trip application, but that's the same form. And as Justice Neck pointed out, Medicare eligibility would seemingly potentially be a time limit here. In fact, that's the whole question here. The defendant has said she's delayed. She's delayed seven years. Yet here we are 13 years later, and they can't still give a firm deadline of when was it due? At what point did it have to be turned in? And not only that, but when was she told it was due by a certain deadline? And if she didn't turn it in, she was waiving her right to this benefit forever because that is their position. She had a one-time shot. She didn't do it their way apparently, and that's it. She loses it forever. And yet- I'm sorry to interrupt you. Is your client reaping a benefit? Is she reaping a windfall as a result of having failed to obtain Section 8 form from the district? Well, Your Honor, not by her actions, frankly. She went to the district initially in 2017 in her trip premiums that she'd paid, the exact amount. This is the amount- Let me be more specific. Is she going to be money ahead by way of her actions, by failing to have obtained the Section 8 form? Under the statute, the legislature has determined that employers who violate their obligations do pay an interest penalty. That's by statute. So she will have some interest. The district during this whole time has benefited from the use of her money despite inflation and all of these things. But again, I don't think- Well, two issues there. First, the interest, the exact amount of interest that will be assessed against the district if the court's ruling is upheld has yet to be determined. It's one of the two collateral issues the trial court hadn't addressed, which was attorney's fees and interest. So their argument about how much interest that they've been penalized by, it hasn't actually happened yet. If they want to address when interest should, does the interest apply from 2010? Does it apply from October 2017 forward? That's an issue that the trial court hasn't decided. And frankly, the defendant hasn't even argued to the trial court yet. That's still one of the last pending collateral issues. So in that respect- Get this $100,000 figure. I believe it was, we did submit after the summary judgment, we submitted attorney's fees and some interest calculations to the court, the trial court. The trial court has opted to not rule on those issues until the ruling comes down from this court. So that hasn't been addressed yet. What did you suggest the interest was? We did suggest that it was dating back to 2010. What was? Exact total. Well, it's a 2% interest, I believe, per month on the amount that was unpaid up to, I believe the statute was amended to 5% interest in 2020 perhaps. It was amended at some question of which amount applies and at what point. And there's also a question of when, how far back it goes. The court hasn't, trial court hasn't made that determination. I'm sorry, go ahead. What was your position? Our position was that it goes back to 2010 for the 2% interest and that when the interest increased for the statutory amendment, then the interest in this case also increased. What would that be? I... What amount did you suggest it would be? Ballpark. I don't care about exact. I'm thinking it was... I did not personally prepare that one. That's why I'm trying to remember off the top of my head what it was and I will find it for you. I... 50,000? Let's back up. 180,000? Let's back up. 5%. Let's assume for the moment it's 5% or let's assume for the moment it's 2%. Justice Harris asked, would your client be ahead? That's a yes or no answer. No, no. She will have more money paid out. Just by the proposal. Yes. Yes. Yes. By our proposal. But I would also say it's not 100%. That's not all due to her action or inaction. It's due to the... I understand that. I understand it. If you prevail and it's 2%, it's going to be considerably more than $18,000. Yes, it will. Well, I think that was the gist of Justice Harris's question. Okay. Is it possible that that amount is somewhere around $100,000? It's possible. Okay. So you have a pretty good idea where the appellant has come up with the number, right? Yes. Because it was your proposal. It took us a long time to get there. Right. Well, and I'm sorry, but I'm going to ask another question on the heels of that. In terms of prejudice, then, you suggested in your brief that appellant has not established or did not specify what the actual prejudice here would be. But if we were to affirm the trial court here, wouldn't that be laying out a roadmap for folks to do what your client did, and that is to not fill out that Section 8 form, wait a period of years, and then proceed just exactly as she has here, and recoup not just the interest, or excuse me, the premium payments, but obtain what looks to be a windfall in the way of this interest? Well, Your Honor, I would go back to the district's answer of, we don't have, we have no numbers regarding that. Is it possible? I suppose so. But the district doesn't have any indication that there are other employees like the plaintiff who did not turn it in. Additionally, the benefit issue is only in place for a limited time period. So, even though the district has never provided any numbers one way or another, the benefit was in place from 2016 to approximately 2018. It was bargained out of the contract for future retirees. So, there is a limited number of people who could even come forward, and I don't know exactly what that number is. The district would have to figure that, but it is limited in that sense. It's not like the writs of certiorari and things in the Pearson case that the defendant cited where, you know, they're just going to be inundated with constant lawsuits over this. There's a limited number of retirees who can even claim this benefit and who didn't already claim the benefit. Counsel, I have another question. Okay. If we were to affirm, is it your belief that interest will be applied? Or does the trial court have discretion regarding the amount of interest or interest and or the amount of attorney's fees? Or is this all dictated by statute? I understand there'll be a difference in whether it goes back to a certain date or starts at a certain date. I'm not talking about that. I'm talking about, is there going to be interest if we were to affirm? Yes, there would be interest, your honor. Okay. And we wouldn't know exactly what it would be depending on how far it went back. Correct. Does the trial court have any discretion in that area? Or is it a matter of law? Well, I think it's a matter of interpretation of the statute. I think the interest goes back to the date of the violation. So it will be when the trial court determines the violation happened. Did it happen in 2010? Or did it not officially happen until 2017? Okay. Okay. Would your client, I'm sorry, would your client have been entitled to any of statutory interest if the district had immediately paid her the money that had not been paid in premiums? No. Okay. And that, but one thing I would like to say about the statutory interest and the district's claim of injury from it is that's the exact scheme that the legislature passed. That is what they intended to do. They passed the Wage Payment Act and specifically made it apply to obligations under CBAs. It specifically applies to school districts and it specifically imposes interest on employers, including school districts who violate their obligations under the CBA. So the use of taxpayer funds to pay those fees imposed by the legislature is implied and I think implicit. Their argument is essentially they're being injured because the statute was written to apply to them in a large sense. That is what the argument is and I don't think that that is a valid argument. And certainly, I mean, quite frankly, they even argued, the district argued that just paying the $18,000 in back premiums, that's an injury to them because it uses public funds. Their position is paying any dollar amount whatsoever injures them because they use public funds. And that's a very inaccurate position because the district itself obligated itself to pay trip premium funds through a retiree's enrollment in Medicare. And that obligation necessarily had to be fulfilled by taxpayer funds. They should have budgeted for it and so therefore paying that, especially in 2017 when plaintiffs went and asked for it, did not injure them With regards to past practice, I would like to point out that defense counsel was completely inaccurate in her representation to date. The only legal authority that the defendant has cited in five years of this case regarding past practice offering them some sort of relief here was to one secondary source about arbitration. This isn't a case of arbitration. Secondary sources are binding. And this was not only pointed out to defendant at the trial court level, but also in our response brief and in the defendant's reply brief, they addressed practices in one paragraph. There was not a single citation to statute, the case, any legal authority. There was not a single citation to facts of any kind. It was argument has no basis in law or fact. And then the subject matter jurisdiction argument hasn't even been addressed. It wasn't addressed by the plaintiff or defendant in its reply brief at all. They didn't respond to our arguments whatsoever. Effectively, I would say conceding them, it wasn't brought up today. I think that we can all agree that that also has no specifically because there's no way for the plaintiff to even follow the grievance procedure that the defendant claims she should have followed. The Supreme Court has held that there is a difference between employees and retirees. Employees have to follow the grievance process and exhaust it. Retirees don't as it's not meant to apply to them. And factually, you can look at the CBA at issue here and see that plaintiff couldn't have followed the grievance procedure. The first step is file a written complaint with your immediate supervisor or principal. The very first payment of her pension that the plaintiff received, even if she had noticed at that point that, hey, the district didn't pay my premiums, she couldn't have filed a grievance because she didn't have an immediate supervisor or principal. The district's head of HR, Geraldine Hammer admitted that during her deposition. Yet they still claim that she should have followed this procedure that she couldn't practically undertake. And then for the unfair labor practice, again, this is this is defendants burden to prove this this affirmative defense. And the defendant hasn't explained how or what what sections this unfair labor practice would have been filed under. The defendant hasn't cited any case law, any facts. And it's just like all of the other three affirmative defenses. These are defendants burden to prove. I don't think that being subject to the statute is a sufficient injury to invoke latches. And there's just literally no facts or case law to support their other their other arguments. And so we would ask that the court deny the defendant's appeal and affirm the trial court's order. As sadly, I want to go back if I could, to latches. And this falls in the category of half baked thoughts. So I apologize here. But without knowing what the actual amounts are for interest and attorneys fees, are we putting the cart before the horse and determining whether or not the school district is able to establish actual prejudice? And I'll just throw out, you know, two hypothetical extremes. Let's say that interest statutory interest would end up being $1 at one end of the extreme and statutory interest at the other end of the extreme was $1 the former, we'd likely be able to say very clearly, you know, that does not constitute evidence of prejudice. And the latter, I think we could, but we don't know at this point what the statutory interest is. So can we say at this point, that the district a can or cannot establish prejudice seems almost a catch 22. Because here we are trying to make that determination before there has actually been any judgment by the court in regards to interest and fees. Uh, yes, Judge, I think this actually goes back to the question that was asked. Oh, and I'm so sorry. I said, Miss Satterley. And I had meant Miss Manline. I apologize to my colleagues, too. I just looked at the wrong name. Yes, Your Honor, I think it is a situation of putting the cart before the horse because we know exactly what the defendant, it's their affirmative defense, it's affirmative defense, it has to prove damages and injury. We don't know what the interest is yet. So how could the district claim that it's proven this injury from the unestablished interest amount at this point? I think that is an excellent point. Well, so are we premature here? Was summary judgment was premature. The summary judgment decided the question of the merits of the case, whether there was a violation or not. The issue of, I think, interest and attorney's fees are collateral issues, just establishing those final numbers. I believe, per the case law, they can be considered collateral issues that don't affect the appealability and a decision on the merits of the summary judgment order. Well, we're talking about the availability of the district's ability to establish the affirmative defense. Isn't it relevant for that? I suppose, yes, given that that's the argument that they're making. But again, our position is that the interest is what the legislature imposed on employers, including school districts. So I don't know how being subject to the statute is an injury to the defendant. OK, thank you. Miss Satterly, you'll still be entitled to your five minutes of rebuttal. Go ahead. Is it my opportunity for rebuttal now? Yes. Thank you. You'll still have your five minutes. OK, thank you. A couple of points. And I think the question that the court had for my colleague, Miss Manline, regarding whether or not the court has discretion on the statutory damages under the Wage Payment Collection Act may answer Justice Harris's question. My reading of the Wage Payment and Collection Act is that the statutory damages are, as a matter of law in the trial court, would not have discretion on imposing those amounts. So there is going to be a significant amount of statutory damages in this case if the court finds that she's entitled to go back to 2010 for those amounts. And if the court finds, and I don't believe this is correct either, but if the court finds that the amendment moving the statutory interest amount penalty to five percent as opposed to two percent per month, that's going to increase the statutory damages even more, even though I don't believe that's a correct reading of the law regarding amendments while a case is pending. There's also some discussion of the district cannot use the statutory interest because that's the scheme that the legislature made and essentially trying to disincentivize employers from not paying wages. But the problem here is that the plaintiff is using that statutory scheme and wielding it as a sword. She's saying, I didn't do what I was supposed to do, and the district needs to be penalized for my failure, not only for the amounts that are owed potentially or allegedly owed under the contract, but for the statutory amounts as well. Now, again, going back to the timeline, a couple of points with the timeliness. Ms. Mainline noted that the district didn't establish when Ms. Moss was required to turn in the form or that she was notified that failure to turn in the form by a certain amount of time would otherwise waive her ability to seek the benefit and that she was given only one shot. She was not given one shot, Your Honor. In fact, when the district first learned, she came to the district and said, why haven't you been paying these? And the district said, we don't have your form on file. We had no idea that you had enrolled. They said, but we can pay your premiums going forward from October 2017. And the plaintiff rejected that offer. So if anything, liability attaches to the district only as of the date that they had noticed that she had enrolled, because that is the purpose of the form. The Medicare eligibility is not the time limit on submitting the form. It's the time limit on when the benefit cuts off. And to your earlier points, Justices, a question was asked about what would happen if someone waited until after they were on Medicare and wanted to come back for the benefit. And that's the exact harm that we're trying to prevent here. The district needs to know that the plaintiff or the retiree has enrolled so that they are properly billed so that TRS bills them. And one final point, there was a mention about the potential prejudice and the 2016 through 2018 contract that bargained this retirement benefit out of the contract. Actually, the language of that contract is that anyone hired after 2017 is not eligible for the retirement award. So that means that a newly hired teacher hired in 2016, that probably is going to be in the district for 35 years before they're eligible for retirement, is still eligible for the retiree benefit in that contract. So we're talking about a massive number of people based on the number of employees, certified employees that the district employs, and that could go on for approximately another 35 years as of 2017. So we're looking at like 2040s, 50s, when the district would be completely out of that benefit. And my final point, I think it's very important, and I made it, but it's important to consider what the plaintiff is asking here. The plaintiff wants the court to penalize the district for her failure to give notice. She said the district was supposed to tell me how to do this. I should have known, should have held my hand and walked me through this and told me about the form. She's essentially saying, hi, court, I'm Peggy Moss. I did nothing for seven years, either because I didn't know that I was entitled to the benefit, or I simply didn't care to look. But once I brought it to the district's attention, I deserve to be paid retroactively back to 2010, plus interest. And that simply cannot stand here. At the very least, as I mentioned before, the district could only be liable for premium amounts either for plaintiff or any other retiree due after receipt of notice that the retiree had enrolled in TRIP. And in this case, it's October 2017, or approximately four months worth. And as such, Your Honor, the district respectfully asks this court to reverse the title court's grant of summary judgment and plaintiff's favor and find in favor of the district. Thank you. All right. Thank you, counsel. Court will take this matter under advisement. The court stands in recess.